# Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*
November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

## This Charter Party, made and concluded in *Johannesburg* ......................................................... *27th.. day of September.......* ...*19/2005*

1  Between *MARVER PROPERTIES S.A.* ..................................................................................................................................................................................................................
2  Owners of the good *PANAMA FLAG BUILT 1981.* ............. Steamship/Motorship *ENRICHER* .................................................................. of .......................................
3  of *13392..* ............................................... tons gross register, and *7567* ................... tons net register, having engines of ........................... indicated horse power
4  and with hull *cargo spaces*, ............................................................................. ton on and about *18962 metric.* ............................... tons of 2240 lbs.
5  and with hull *cargo spaces*, machinery and equipment in a thoroughly efficient state *and appearance*, and classed *BV* ...................................................
6  at .............................................. of about *24716.5* ............................ cubic *metres* in bale capacity *available for cargo*, and about one-half percent of ship's deadweight capacity,
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of ............................................. feet .................................... inches on ........................... Summer freeboard, inclusive of permanent bunkers,
9  Vessel to be placed at the disposal of the Charterers, *as on dropping last outward sea pilot safe port Owner's option CHINA any time day or*
10  which are of the capacity of about ...................................................................................................... tons of fuel, and capable of steaming, fully laden, under good weather
11  conditions about *13 ......* knots on a consumption of about *24 metric* tons of *IFO 180 cst plus about 2.5 metric tons MDO* best Welsh coal - best grade
12  now *trading - see also Clause 54 and description as in attached Description Clause (Clause 80)* ................................. Charterers of the City of *AMSTERDAM.* ..........
13  fuel oil - best grade Diesel oil. .......................... and *Messrs MUR SHIPPING BV* .............................................................................................................................

## Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *minimum 6 to about 9 months time charter always 15 days more or less in Charterers option on minimum/maximum period*
15  *trading via a safe port(s)/safe berth(s)/safe anchorages always afloat always within IWL in/out geographical rotation always afloat except*
16  *NAABSA as per NYPE clause 6 within below mentioned trading limits.* ...........................................................................................................................................
17  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
18  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of obligations hereunder ................*
19  Vessel to be placed at the disposal of the Charterers, *as on dropping last outward sea pilot safe port Owner's option CHINA any time day or*
20  *night Sundays and holidays included* .................. in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as
21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be
22  ready *and fit in every way to receive and carry any permissible cargo and to be maintained in such condition during the entire period of*
23  *this Charter Party* to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and
24  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches or *cranes* at one end and the
25  same (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
26  dise, including petroleum or its products, in proper containers, excluding *see Clause 52.* ...............................................................................................
27  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
28  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
29  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Europe
30  Mexico, and/or South America *Port Wide Trading within IWL. See Clause 48.* ...........................................................................................................
31  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
32  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

"B"

32  
33  
34  
35  as the Charterers or their Agents shall direct, on the following conditions:  
36     That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees *including agency fees if any -*  
*ref Clause 87* of the Crew, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep  
37  insurance in a thoroughly efficient state in hull, *cargo spaces* machinery and equipment for and during the service.  
38  the vessel in a thoroughly efficient state in hull, *cargo spaces* machinery and equipment for and during the service.  
39     That *white on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *Customary* Pilotages,  
40     Agents, Commissions,  
        Consular Charges (except those pertaining to the Crew), *and flag of the vessel* and all other usual expenses except those before stated, but when the  
41     vessel puts into  
        a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of  
42     illness of the crew *or cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while  
        vessel is employed under this  
43     charter to be for Charterers account. All other fumigations to be for Charterers account, after vessel has been on charter for a continuous period  
44     of six months or more.  
45        Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but  
46     Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards  
47     for dunnage, they making good any damage thereto.  
48        3.   That the Charterers, at the port of *on* delivery, and the Owners, at the port of *on* re-delivery, shall take over and pay for all fuel remaining on  
49     board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ..................... tons and not more than  
50     ............................... loss and to be re-delivered with not less than ....................... tons and not more than ................ tons *as per Clause 54.*  
51        4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *49 per Clause 29.*  
52  
53  stores, in ........................ summer freeboard, per Calendar Month, commencing on and from its day of her delivery, as aforesaid, and at  
54  and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary  
55  wear and tear excepted, to the Owners (unless lost) *see Clause 90*....................  
56  ............................. unless otherwise mutually agreed, Charterers are to give Owners not less than *15/10/X/5/2/1 days*  
57  notice of vessels expected date of re-delivery, and probable port.  
58     5.   Payment of said hire to be made *as per Owner's banking details* in New York in cash in United States Currency, semi-monthly *every 15*  
*(fifteen) days* in advance, and for the last half-month or  
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes  
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the  
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-  
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day *see Clause*  
       29.  
63  following, that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they  
64  to have the privilege of using vessel at once, such time not to count as hire.  
65        Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, *subject to Owner's approval,* by the Charterers or  
       their Agents *at their discretion,* subject  
66  to 2 1/2% commission, and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application  
67  of such advances.  
68        6.   That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *in port or elsewhere* that Charterers  
69  or their Agents may  
       direct, provided the vessel can safely *enter* lie always afloat *and depart* at any time of tide, except at such places where it is customary for similar size

vessel to satisfy

70 lie aground.

71 7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
74 paying Owners ............................ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75 incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76 8.    The the Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
77 agency; and Charterers are to load, stow, and trim, *lash unlash, tally and discharge* the cargo at their expense under the supervision of the Captain,
78 boats. The Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
79 who is to sign Bills of Lading for
cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *However the Master and Owners nevertheless to remain ultimately*
*responsible for the seaworthiness and safety of the vessel in all circumstance.*

80 9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary *and practical,* make a change in the appointments.

82 10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost dispatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85 Clerks, Stevedore's Foreman, etc., Charterers paying *USD 1200 lumpsum per month pro rata for cables/victualling/entertaining* at the current
rate per meal, for all such victualling.

86 11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine Logs in English,* showing the course of the vessel and
distance run and the con-
sumption of fuel.

89 12.    That the Captain shall use diligence in caring for the ventilation of the cargo.

90 13.    That the Charterers shall have the option of continuing this charter for a further period of *as instructed by the Charterers*
91 .................................................................................................. days previous to the expiration of the first-named term, or any declared option,

92 ........................................................................................................................................................................................................................ and should vessel

93 14.    That if required by Charterers, time not to commence before *10 November 2005.* ...............................................................................................

94 not have given written notice of readiness on or before *25 November 2005.* .............................................. but not later than 4 p.m. *24.00 hours local time.* Charterers or

95 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

96 15.    That in the event of the loss of time from deficiency *and/or default and/or strikes of officers and crew whether due to labour dispute*
97 *or otherwise deficiency* of men or stores, fire, breakdown or damages to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra *directly/proven and duly supported by vouchers* expenses shall be deducted from the hire.

102 16.    That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

107 17.    *Arbitration as per Clause 61.*    That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to
108 three persons at New York,
109 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter, including
111  General Aver-
112  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
113  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
114  might have priority over the title and interest of the owners in the vessel.
115  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
116  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
York-Antwerp Rules 1924, *1994 as revised in London*, at such port or place in the United States as may be selected by the carrier, and as to matters not

117  provided for by these
118  Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
119  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
120  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
121  bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
122  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
123  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
124  carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
125  place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
United States money.

In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,
126  whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
127  goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
128  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
129  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
130  ships belonged to strangers. *See New Jason Clause as printed.*
131
132      Provisions as so stipulate in accordance with the above are to be included in all bills of lading issued hereunder.
133  20. Fuel *(Bunkers)* used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed as to quantity, and the
134  cost of replenishing same, to be allowed by Owners.
135  21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138  *Drydocking only in the event of an emergency*
139
140  22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *crated derricks*) capable of handling lifts up to *maximum capacity*
*In accordance with Description Clause* lines tons, also
141  providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient light for night*
143  *work in all holds simultaneously* hatchmen and oil for
night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144  Charterers to have the use of any gear on board the vessel. All winches *cranes* to be in proper state for the service.
145  23. Vessel to work night and day and *on Sundays and holidays*, if required by Charterers, and all winches *ordered by the Master to be*
*for Owner's account. All other watchmen including compulsory to be for Charterer's account,*
146  during loading and discharging. All *watchmen including compulsory to be provided and paid by Charterers.* Watchmen *ordered by the Master to be*
147  *for Owner's account.* steamer to provide one watchman per hatch to work watches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
148  deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
149  port, or labor unions, prevent crew from driving winches, shore Watchmen to be paid by Charterers. In the event of a disabled winch or winches, or
150  insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
151  thereby. *See Clause 37.*
24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153  etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder:

155                                         U. S. A. Clause Paramount

156    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157  16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158  any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159  be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160                                 Both-to-Blame Collision Clause

161    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect, or default of the
162  Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163  hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164  or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165  carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166  owners as part of their claim against the carrying ship or carrier. *See Both-to-Blame Collision Clause as attached.*

167    25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging. *Trading always via ice free port(s) and vessel not to follow ice breaker(s). See*
     *also Clause 44.*

170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilots and tugboats* insurance, crew, and all other matters, same as when trading for their own account.

172    27. A commission of £1.25 9½½ per cent is payable by the Vessel and Owners to

173  *FRANK SYMONS LIMITED LONDON.* ............................................................................
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175    28. An address commission of 2½½ 3.75 per cent payable to *Charterers* ............................. on the hire earned and paid under this Charter.

*Additional Clauses 29 to 93, Cancelling Clause, New Jason Clause, General Paramount Clause and NEW Both-To-Blame Collision
Clause, as attached, to be included in all Bills of Lading issued under this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

RIDER CLAUSES TO M.V. 'ENRICHER' CHARTERPARTY DATED 27 September 2005

29.Hire

a)  The Charterers shall pay for the use of the vessel at the rate of US Dollars 9,500  (USD Nine Thousand  Five Hundred US Dollars ) daily including overtime,commencing from the day/time of her delivery payable every
15 days in advance or pro rata for any part of a day up to the day/time of her redelivery.GMT will apply on delivery and redelivery respectively.

b) It is agreed that the hire is to be considered correctly paid upon receipt of same to Owner's bankers as stated hereunder

However in the event of default in the payment if hire,Owners are to telex Charterers informing them of the default. Owners are not to withdraw the vessel if Charterers make good the default within three clear bank working days of  Receiving Owner's notification or provide a guarantee to secure the alleged under or non payment within such period.

c) Hire – see Clause 5 – to be paid every 15 days in advance to:

NEGUEL SHIPPING INC PANAMA

KREDIETBANK SA LUXEMBURGEOISE
43 BOULEVARD ROYAL
LUXEMBOURG
SWIFT CODE KBLXLULL – TELEX 3418

A/C NO 52-24596822

INTERMEDIARY BANK
KREDIETBANK NEW YORK
A/C NUMBER 10149405
SWIFT CODE KREDUS33

REF – ENRICHER/MUR

d) The Charterers have the liberty to retain sufficient funds from any hire to cover actual and estimated (max USD 1000 per port) amounts which to be duly supported by vouchers in due course , including actual off-hire and from the last sufficient hire payment value of estimated bunkers on redelivery for Owners' account.

30. NOTICES

Owners/Master shall give notice on fixing and then 5 days approximate and 3/2/1 days definite notice of delivery to:

MESSRS METAL UND ROHSTOFF SHIPPING RSA (PTY) LTD
187 RIVONIA ROAD
MORNINGSIDE,SANDTON
SOUTH AFRICA
TEL – 0027113020000
FAX – 0027118831545
TELEX 420617 MUR SA
CABLES MACFEAST JOHANNESBURG

31. HOUSE-FLAG MARKINGS – Deleted

32. ARREST/SEIZURE

Should the vessel be arrested and/or seized during the currency of this Charterparty at the suit of any person having or purporting to have a claim against , or any interest in the vessel or by any other default of the Owners, hire under this Charterparty shall not  be payable in respect of any period whilst the vessel remains under arrest only if such arrest affects loading,discharging operations or otherwise delays the vessel ( or prevents performance of the service  next required by the Charterers ) and the Owners shall reimburse to the Charterers any direct, proven and duly supported by vouchers expenditure which they mave incur under this Charterparty in respect of any period during which by virtue of the operation of this clause no hire is payable unless such arrest is caused by actions of Charterers and/or their sub Charterers and/or their agents.

33. VESSEL DETENTION

Should the vessel be seized and/or detained and/or geographically constrained in relation by any government or body (whether legally constituted or not) or by any persons acting out of a malicious,belligerent or political motive or as a result of any action by any such government body or persons,the vessel shall be off hire for all time thereby lost and fuel oil/diesel oil consumed and all port charges whilst off-hire for Owners account,unless vessel be seized and/or geographically constrained due to Charterers and/or sub-Charterers and/or their servants legal or illegal actions,trade and service in which case vessel to be on hire and all expenses arising therefrom to be for Charterers account.

34. DISCRIMINATION

In the event of loss of time due to boycott of the vessel by shore labour or arising from government restrictions by reasons of vessel's flag or the terms and conditions by which members of the crew are employed  or by any reason of Owners' operation or control,vessel to be off-hire and all  directly related expenses to be for Owners' account.

35.That in the event of the loss of time from deficiency of men or stores and/or default and/or strikes of officers and crew whether due to labour dispute or disputes with Unions or associations concerned or connected with Owners affairs or otherwise,fire,breakdown or damages to hull,machinery or equipment,grounding,detention by average accidents to ship or cargo,dry docking for the purpose of examination or painting bottom or other necessary to maintain the efficiency of the vessel, or by any other similar cause whatsoever preventing the full working of the vessel,the payment of hire shall cease for the time thereby lost,and if upon the voyage the speed be reduced by defect in/or breakdown of any part of her hull,machinery or equipment,the time so lost,and the cost af any extra fuel consumed in consequence thereof and all extra expenses shall be deducted from the hire.

Should the vessel deviate or put back during a voyage contrary to the orders or directions of the Charterers for any reason except saving life,the hire to be suspended from the time of her putting back or deviating until she is again in the same or equidistant position from the destination and the voyage resumed therefrom.

After suspension of hire from any cause ,the vessel shall be placed at Charterers disposal at the same port or position where hire was suspended.Charterers may,however, in their option accept the vessel on hire again in such position and at such time as the vessel may again in all respects be ready to comply with the orders and directions of the Charterers.provided always to be either same port/position or equidistant.

The Charterers may in their option at any time add to the Time Charterparty period,partly or wholly any off-hire period(s).The rate of hire for any such added period(s) shall be paid at the same rate as that applicable during the off-hire period(s).

During any off-hire period estimated to exceed 8 days,the Owners to give the Charterers not less than 3 (three) days definite notice of resumption of the service.

If the vessel has been off-hire for a period of 20 ( twenty) consecutive days during this Charterparty,the Charterers shall have the option but to cancel this Charterparty and redeliver the vessel.

36. Normal quarantine and expenses to enter the port to be for Charterers account but any time of detention and expenses for quarantine due to pestilence,illness etc of Master,officers and crew,to be for Owners' account.

37. GEAR BREAKDOWN

In the event of partial or total breakdown and/or of unavailability of ship's derrick(s)/crane(s) for any reasons whatsoever the hire to be reduced pro rata for the period of such breakdown and/or unavailability in relation to the number of vessel's holds available.If Charterers in their opinion continue work on hatch or hatches affected by breakdown by hiring shore appliances,Owners are to pay for extra shore appliances but in such case Charterers are to pay full hire for all time shore appliances are working.Any stevedoring charges additionally accruing due to breakdown of vessel's equipment,including cost for standby of stevedores limited to one shift ,to be for Owners' account.

## 38. READINESS

On arrival at the first load port vessel's holds to be swept,fresh water washed and cleaned , dry and free of all remains of previous cargo and loose rust and scale,free of infestation to Charterers surveyor's satisfaction, and  the Owners warrant that the vessel is in every way fit to receive any cargo permissible under this Charterparty.In case the vessel fails to pass inspections as requested by the Charterers and/or their surveyors then the vessel shall be off hire from the time of rejection until such time as the vessel passes inspection. Nevertheless it is a condition of this Charter that the vessel shall fully comply with all Charterers inspectors Requirements with 5 days after failing first inspection ( provided the vessel has arrived within the laydays as agreed) otherwise the Charterers shall have the option of cancelling this Charter.


## 39. CERTIFICATE/VACCINATIONS

Owners are obliged to deliver and keep the vessel ,her crew and anything pertaining hereto supplied with all the required up-to-date and valid international trading certificates,enabling the vessel and her crew to load,carry and discharge all cargoes permitted under this Charterparty and to call at all ports for cargo operations and/or to receive bunkers within the trading limits of this Charterparty.

It is the responsibility of the Master and the Owners to arrange for any special vaccination required at all ports of call and to keep on board corresponding valid certificates.

If Owners fail to comply herewith any time lost and all extra expenses to be for Owners account and Charterers may deduct same from hire.


## 40.SURVEYS

Joint on-hire plus bunker survey to be held at first load port during waiting or loading time and joint off-hire plus bunker survey to be held prior to redelivery during waiting or discharge time.Costs to be shared 50/50. Any time lost at load to be for Charterers account and any time lost at discharge to be for Owners account.

41. In the event  of loading steels pre-loading survey is to be carried out by Owners P and I club surveyor at Owner's expense.

Master is at liberty to insert Owners' P and I Club surveyors remarks on Mate's receipts.

## 42. INTERNATIONAL TONNAGE CERTIFICATE

Upon delivery the vessel shall have on board an International Tonnage Certificate valid for the duration of this Charterparty and such Tonnage certificate shall be acceptable by the local authorities at the countries of call within the trading limits of this Charterparty.Should such certificate not be acceptable to the local authorities any time lost and all extra direct,proven and duly supported by vouchers expenses for issuing an acceptable certificate are to be for the Owners' account.

## 43. ITF/FLAG RESTRICTIONS

Owners warrant that the officers and crew of the vessel are covered for the duration of this Charterparty by an ITF agreement or other bona fide Trade Union agreement conforming to ITF standards acceptable world wide covers the officers and crew of the vessel for the duration of this Charterparty.Loss of time and extra expenses incurred as a result of non compliance shall be Owners account and may be deducted from hire.

The Owners are responsible for any loss of time or delay or restriction to the full working of the vessel resulting from any action that may be taken against the ship and/or the Owners by third parties for any reason that Owners are responsible.Any time lost as a consequence of any such action by third parties shall be considered as off-hire and shall be deducted from the hire.Any extra expenses resulting directly from such action shall be the responsibility of and paid for by the Owners or,in Owners option,shall be paid by Charterers and deducted from the hire.

Owners warrant that the vessel is not blacklisted by any country within the trading limits of this Charterparty.

## 44. OIL POLLUTION

Notwithstanding any terms or conditions stated elsewhere in this Charterparty it is warranted that during the currency of this Charterparty Owners will comply fully with any legislation enacted with respect to oil or other pollution (such expression to include any rules and/or regulations issued thereunder) by any government including federal,state or municipal or other division or authority thereof. In particular, Owners to establish and maintain at their expense such financial security or responsibility in respect of oil or other pollution damage as may be required by any such legislation.Should any delay to the vessel or any extension of the voyage occur from failure of Owners to comply with such oil or other pollution legislation, the vessel is to be considered off-hire for the period of such delay.Owners hereby accept responsibility for all the direct consequences and agree to indemnify Charterers against all claims,liabilities and costs (including Charterers' legal fees) which result from Owners failure to comply fully with such oil or other pollution legislation.

## 45. P AND I CLUB/CARGO CLAIMS

Owners warrant that the vessel is entered and shall remain entered in a Protection and Indemnity Association for the duration of this Charterparty.Entry shall include, but not be limited to, full cover for cargo claims of any nature and Owner's liability for personal accidents or injuries incurred by third parties on board or about the vessel.

Vessel is presently entered with the AXA Corporate Solutions..

## 46. CLAIMS

All claims of whatsoever nature (excluding cargo claims) to be deemed to be waived and barred unless arbitration in accordance with Clause 61 is commenced within 12 months of vessel's redelivery.

Any cargo claim to be settledin accordance with the Interclub NYPE Agreement with amendments to date but subject to notification of claims within 15 months of cargo discharge instead of the 2 years provided by the Interclub Agreement.

## 47. LIABILITY INSURANCE

Delete

48. TRADING EXCLUSIONS

The vessel shall be employed in such lawful trades between safe ports and places within IWL excluding:

CAMBODIA/NORTH KOREA/RUSSIAN PACIFIC COAST/USA/CANADA/ISRAEL/CUBA/
AUSTRALIA/NEW ZEALAND/SCANDINAVIA/ZAIRE/IRAQ/ALBANIA/SOMALIA/BANJUL/
SIERRE LEONNE/LIBERIA/TURKISH OCCUPIED CYPRUS/ALL CARGO TO YEMEN/
BAGGED CARGO TO NIGERIA

And all countries where United Nations impose trade sanctions and countries where war and warlike
Situations exist.

Any other countries prohibited from call at by the flag State.

Charterers to get proper official port clearances by actual calling of an intermediate port for the trading
between Taiwan and Republic of China at their time/expense.

49. WAR RISK INSURANCE

Basic annual war risk insurance of vessel and/or crew to be for Owners account.Any extra war risk insurance
premium charged by Owners Underwriters by reason of vessel's trading under this Charterparty to be for
Charterers account and to be refunded to Owners by Charterers upon receipt of Owners Underwriters invoices.
All additional war risk insurance to be based on minimum rates of Lloyd's London Underwriter's Committee.
Any crew war bonus payable by reason of vessel's trading under this Charterparty to be refunded to Owners
by Charterers.

50. BIMCO ISM CLAUSE

The BIMCO ISM Clause to apply throughout the currency of this Charterparty.

From the date of coming into force of the International Safety Management (ISM) Code in relation to the
vessel and thereafter during the currency of this Charterparty, the Owner shall provide that both the vessel
and 'the Company' (as defined by the ISM code) shall comly with the requirements of the ISM code. Upon
request the Owners shall provide a copy of the relevant document of Compliance(DOC) and Safety
Management Certificate (SMC) to the Charterers.Except as otherwise provided in this Charterparty, loss,
damage,expense or delay caused by failure on the part of the Owners or 'the Company' to comply with the
ISM code shall be for Owners' account.

51. INTERMEDIATE HOLD CLEANING

USD 500 per hold including per hold including washing down with fresh water.Crew/Owners
Are not responsible if vessel fails inspection and vessel to remain on hire.

52. CARGO EXCLUSIONS

Vessel to trade with lawful merchandise,except for the following commodities,which always to be excluded:

LIVESTOCK/PETROLEUM OR ITS PRODUCTS/NUCLEAR AND-OR RADIOACTIVE
MATERIALS,PRODUCTS,WASTE/ACIDS/MOTOR SPIRIT/CALCIUM CARBIDE/ARMS/
AMMUNITION AND FIREWORKS/SUNFLOWER SEED EXPELLERS/ASPHALT/WET
HIDES/NAPTHA/CHARCOAL/TAR/DIRECT REDUCED IRON ORE PELLETS/HYPOCHLORITE/
SPENT OXIDE/CANARY SEED/FISSILE MATERIAL/IRRADIATED NUCLEAR WASTE/
HAZARDOUS WASTE/POND COAL/BLACK POWDER AND BLAST CAP NITRATES/
EXPLOSIVES/FERRO SILICON/PENCIL PITCH/SULPHUR/SALT/
MOTOR BLOCKS AND TURNINGS.

All cargo to be loaded,stowed,carried and discharged in accordance with IMO regulations.

Charterers have the option to carry 2000 mt Bagged ammonium nitrate (IMO 5.1/UN NO 1942) provided same always
loaded/stowed/labelled and discharged strictly in accordance with IMO and Local regulations.

Charterers option to load two cargoes of green delayed or calcined petcoke and one cargo bagged sulphur.Petcoke or
Sulphur to be loaded in accordance with IMO/local regulations and not to be the last cargo under this Charterparty.

53. The Charterers are to have the option to carry full deck loads within the capability of the vessel's and the
deck/hatch strengths in accordance with usual marine practice and deck load will be controlled by vessel's
stability and seaworthiness and always at Master's discretion and satisfaction and at Charterers risk and
expense.Bills of lading to be claused ' carried on deck at Charterer's/Shippers' risk and expense' howsoever
caused.

54. BUNKERS

Bunkers on delivery to about 175-240 metric tons Intermediate Fuel Oil and about 35-60 metric tons Marine Diesel Oil
Bunkers on redelivery to be about same as actually on delivery.
Prices same both ends USD 330 per metric ton IFO plus USD 575  per metric ton MDO.As long as same
does not interfere with Charterers discharge operation Owners to have option of taking bunkers prior redelivery.

Charterers to take over and pay for bunkers on delivery together with first hire payment.Owners to have the
option to bunker the vessel for their account at a convenient port without interfering with the vessel's operations.

The Charterers shall have the liberty to bunker the vessel for their own account before delivery,provided
same does not interere with Owners` business.

Upon delivery or at first or subqesuent port(s) after delivery and upon redelivery or at the last port(s) prior to
redelivery, a joint bunker survey shall be made in order to establish bunker figures which shall be final and
binding upon both parties.

Charterers have the option to supply RMF 25 in South Africa where RME 25 is not available.

Where Owners have merely stated MDO in the description Clause then Charterers have the option to supply
MDO according to BSMA 100 1989 M3 (ISO 8217 1987 DMC)

Bunker supply at Singapore always to be in accordance with the Singapore authority bunkering procedure.

BIMCO Marpol Clause as attached to apply.

## 55. VESSEL'S PERFORMANCE

Will be monitored by an independent weather routing company appointed by Charterers at Charterers expense and if vessel's performance should fall short of described speed, Charterers shall advise Owners immediately providing them with reports of independent weather routing company.All matters regarding hire/bunkers to be settled/adjusted at vessel's redelivery.

The independent weather routing company will, prior to vessel's departure from port,give the Master a recommended route to the next port of call and make further recommendations during voyage.However the decision and responsibility for the final route selection will be the Master's.The Master will comply with the reporting procedure of the routing service selected by the Charterers.

Evidence of weather conditions shall be taken from the vessel's deck logs and independent weather bureau's reports (the Independent Weather Routing Company).In the event of a discrepancy between the deck logs and the independent weather bureau reports,then weather bureau's reports shall be taken as binding on both parties.It is understood vessel's speed and consumption warranty is applicable only basis conditions upto and including Beaufort Scale 4.

If the Charterers have reason to be dissatisfied with the performance of the vessel,the Owners,upon receiving complaints shall immediately investigate and take appropriate steps to correct the situation.

## 56. MASTER'S/CREW'S ASSISTANCE

With reference to Clause 8 of this Charterparty hire to include ' customary assistance' which shall mean all types of work which the Master and the crew would normally do when the ship is trading for the Owners' account provided that all or part of such works are permitted by port authority and/or local regulations such as, but not limited to:

a)   raising and lowering and rigging derricks/cranes and/or gangways in preparation for loading and/or discharging
b)   opening and closing of hatches in connection with loading and discharging,if local regulations permitting
c)   closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging if local regulations permitting
d)   customary supervisions of loading and discharging.Master to remain responsible for the stowage of the vessel insofar as this concerns the trim and/or stability of the vessel.
e)   Maintaining sufficient steam/electric power and all cranes in good order whilst loading and discharging including regular maintenance of derricks/cranes
f)   Shifting vessel during loading and discharging and shifting berth
g)   docking and undocking
h)   bunkering
i)   weather permitting, officers and crew to shape up vessel's hatches and derricks/cranes as much as possible prior too arrival at loading and/or discharging ports or places so as to immediately commence loading and/or discharging operations.

## 57. HATCH COVERS

Vessel's hatch covers are and to remain during the currency of this Charteparty in proper condition,totally watertight/weathertight.Any time lost and/or expenses incurred as the result of hatch vovers not being weather/watertight to be for Owners' account.

58. BILLS OF LADING

Charterers or their agents are herewith authorised to issue and sign Bills of Lading as presented on Owner's/Master's behalf in accordance with Mate's receipts without prejudice and/or reference to this Charterparty.Master to advise Charterers directly of any notation made on Mate's receipt.Charterers indemnify Owners against all consequences incurred to the vessel or Owners as a result of signing Bills of Lading by the Charterers and/or sub-Charterers and/or their agents in niot conforming with Mate's receipts.

59. SUPERCARGOES/PORT CAPTAINS

The Charterers and/or their supercargo(es) shall have free and unlimited access to the whole vessel including bridge,holds and engine room and also to all vessel's tanks,including but not limited to : bunker,lubricating oil sludge,ballast and freshwater tanks.Whenever required the Master must bring the vessel into even trim to ensure correct bunker soundings.The Charterers and/or their supercargo(es) and/or surveyors to have free and unlimited access to the vessel's decks and engine log books,tank plans,calibration scales and/or other plans as requested and are allowed to make copies of the original log books on board or ashore.

Charterers to sign and send to Owner's office Letter of Indemnity as per Owner's text in case they decide to place the Supercargo and/or their representative on board.

60. STEVEDORE DAMAGE CLAIMS

Any damage caused by stevedores during the currency of this Charterparty shall be reported by the Master to the Charterers or their agents,in writing,within 24 hours of the occurrence or discovery (in the case of hidden damage But same to be reported latest on sailing port of discharge for each voyage) otherwise Charterers not to be responsible.The Master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been good in the meantime.

Stevedore damage affecting seaworthiness or the proper working of the vessel and/or her equipment shall be repaired without delay to the vessel after each occurrence in the Charterer's time and shall be paid for by the Charterers.Other repairs shall be done at the same time,but if this is not possible,same shall be repaired whilst vessel is in drydock in the Owner's time provided this does not interfere with the Owner's convenience. All proven costs of such repairs shall be for the Charterers account.

61. LMAA ARBITRATION CLAUSE

All disputes or differences arising out of or under this contract which cannot be resolved amicably shall be referred to arbitration in London.

Unless the aprties agree upon a sole arbitrator,one arbitrator shall be appointed by each party.In the case of an arbitrator on documents,if the two arbitratos so appointed are in agreement,their decision shall be final. In all other cases the arbitrators and the reference shall be to the three-man tribunal thus constituted.

If either of the appointed arbitrators refuses to act or is incapable of acting the party who appointed him shall appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator,whether originally or by way of substitution for two weeks after the other party,having appointed his arbitrator,has ( by telex/fax) called upon the defaulting prty to make the appointment, the President for the time being of the London Maritime Arbitrator's Association shall,upon application of the other party,appoint an arbitrator on behalf of the defaulting party and that arbitrator shall have the like powers to act in the reference and make an award (and , if the case soo requires,the like duty in relation to the appointment of a third arbitrator) as if he had been appointed in accordance with the terms of the agreement.

This contract is governed by English law and there shall apply to all proceedings under this clause the terms of the London Maritime Arbitrators' Association current at the time when the arbitration proceedings were commenced.All appointees shall be members of the Association.

Provided that where the amount in dispute does not exceed the sum of USD 50,000 any dispute shall be resolved in accordance with the Small Claim's Procedure of the London Maritime Arbitrator's Association.

62. LIEU OF HOLD CLEANING ON REDELIVERY

The Charterers have the option ro redeliver the vessel with unclean holds including removal/disposal of dunnage/lashing material/debris in consideration for which Charterers are to pay a lumpsum of USDollars 4,000 including removal/disposal dunnage/lashing materials.

63. When indicating speed of 'about' this gives the vessel an allowance of half a knot.'Good weather' is accepted as up to/including weather of Beaufort 4 and Douglas Sea state 3.

64. FITTINGS

Charterers to have the option to weld padeyes and/or other lashing/securing devices/points at their expense and subject to the Master's approval which not to be unreasonably withheld.Charterers to remove all such padeyes and/or other lashing/securing devices/points prior to redelivery.Charterers have the option not to remove padeyes etc. in consideration of which Charterers are to pay USD 15.00 per padeye etc.Any lashing/separation materials required to be provided and paid for by the Charterers.

## 65. GRABS

Charterers to have the liberty to use suitable and in accordance to vessel's gear lifting capacity grabs for loading/discharging in all cargo holds subject to arrange such grabs at Charterers time and expense.Vessel's holds/hatches to be clear and free from all obstructions and suitable in every respect for grab discharge.All/any pipes/wires/cables to be covered and protected and Owners to be responsible for any/all damage if incurred due to vessel's non compliance with this Clause.

## 66. SAFE BALLAST

Owners guarantee vessel always to be safe in ballast and it is agreed that if any solid ballast is required , all expense for same including time used in loading and discharging to be for Owners account.

## 67. BALLAST/DEBALLASTING

Vessel to ballast/deballast clean water ballast tanks if required by Charterers or their agents at any time during loading and/or discharging, free of expense to Charterers but in Charterers time.All ballasting/deballasting shall be at the discretion of Master having due regard to stability and seaworthiness of the vessel.(for guidance only deballasting times about 8/10 hours only for upper/lower ballast tanks always excluding hold ballast.)Owners warrant that the vessel is not blacklisted by Richards Bay Coal Terminal (RBCT) and furthermore that the vessel in every way complies with RBCT rules and regulations.

## 68. GENERAL AVERAGE

Hire not to contribute to General Average.

69. Vessels main engine uses MDO for maneouvering in/off ports,rivers,canals and in poor visibility.

## 70. HOSE TEST

Charterers to have the option to hose test or ultra sonic test the vessel's hatchcovers at the loading port(s) at their time/expense and should same not be watertight,Owners have the obligation to arrange necessary measurements in order to make the hatchcovers fully watertight.Owners shall be given by Charterers three working days after which if the hatchcovers are not watertight ,Charterers have right to cancel this c/p and redeliver the vessel,provided no cargo is onboard.

71. Deleted.

## 72. BOYCOTTS

In the event of loss of time,boycott of the vessel or any labour trouble by shore labour,seamen's unions,tugboats,pilots,linesmen,stevedores and local authorities etc.,whether official or unofficial, arising by reason of vessel's flag,nationality or registry,her ownership,terms and conditions on which crew members are employed on this or any other vessel under the same ownership and/or operations and/or control payment of hire shall cease for the time thereby lost.

73. CUSTOMS/FINES

Owners to be responsible for customs' fines and to put up security in case of necessity if Owner's vessel is proven responsible and if so demanded by local authorities for Owner's matter unless fines imposed to the vessel due to cargoes and/or Charterers and/or sub-Charterers and/or their agents omissions or faults in which case any expenses including security if necessary to be provided and paid by Charterers and vessel to remain fully on hire.Any dispute as to ultimate liability arising insofar to be decided according to the terms and conditions of this Charterparty.

Owners to be responsible for any fines whatsoever in the event of smuggling acts by their own officers and/or crew,Owners passengers and/or stowaways and Owners to remain responsible for detention of the vessel due to smuggling and any other expenses arising from these acts.Charterers to be similarly responsible in respect of Charterers representatives and/or servants.

74. Deleted

75. PLANS

Immediately on vessel being fully fixed Owners to courier to Charterers a good and reliable copy of each of vessel's Capacity Plan and General Arrangement Plan and Midship Section Plan,this to include deadweight scale.

76. For the purpose of conducting a draft survey,the vessel must have on board certified calibrated scales for vessel's tanks and double bottoms and capacity plans,displacement scale and any other documents and information necessary for conducting a draft survey.The vessel's marks fore/aft/midship to be clearly legible.

77. SUEZ/PANAMA

Throughout the period of this Charter, vessel to be properly equipped to transit the Suez and Panama Canals , to have on board current,valid Suez Canal and Panama Canal certificates and vessel and her fittings to comply with all applicable requirements/regulations of the Canal authorities.Any delays and extra expenses incurred in transit of Canal through vessel's lack of proper certificate and/or fittings and equipment to be for Owner's account.

78. If Charterers wish to load hot rolled coils then Owners confirm that coils may be loaded line for line in as many tiers as is necessary but always within vessel's permissible tanktop strengths and to Master's satisfaction with regard to stress,trim and stability requirements.Coils to be loaded and stowed in accordance with American standard loading procedures and in compliance with load/discharge port requirements.Above cargo to be adequately dunnaged and lashed to ensure safe stowage to Master's satisfaction .

79. Garbage disposal always for Owner's account.

80. VESSELS DESCRIPTION – AS PER ATTACHMENT

Owners warrant that the vessel is entered with and fully covered by a PANDI Club that is a member of the International Group of PANDI Clubs.
Owners warrant that the vessel is classed and will remain so throughout the currency of the Charterparty by a Classification Society that is a full member of the International association of Classification Societies.

Metal and Rohstoff Questionnaire

1. General
Last updated by:
1.1 Vessel M.V. ENRICHER
1.2 Previous Names OCEAN WAVE / OCEAN GLORY / SEA ARCHITECT
1.3 Flag PANAMA
1.4 Construction date 3/ 1981
1.4 Construction place CHINA
1.5 Yard name and no. CHUNG HUA SHIPYARD
1.6 IMO No. 7725350
1.6 Lloyds number — (BV Number 81L016)
1.7 Class of Vessel BV
1.8 Port of Registry PANAMA
1.9 Owners MARVIER PROPERTIES S.A
1.10 Managers SEALION SHIP MANAGEMENT LTD. MUMBAI
1.11 Disponent owners

2. Particulars – A
2.1 Vessel Type TWEEN DECKER
2.2 DWAT / Draft / Immersion
DWAT metric
Type Tons Draft TPI / 77.4MT
Summer 18962MT @ 9.744M
Winter 18346MT @ 9.541M
Tropical 19584MT @ 9.947M
Fresh Water 18962MT @ 9.962M
Tropical FW 19584MT @ 10.165M
2.3 Is Vessel fitted for transit:
Panama Canal YES (PRESENTLY NOT WORKING)
Suez Canal YES
St. Lawrence Seaways NO
2.4 Panama: state deadweight
2.5 Affect by bilge turn radius
2.6 St. Lawrence: state deadweight
2.7 GT / NT
International 13392 / 7567
Suez 13924.54 / 10908.60T
Panama 14579 / 10733
British
2.8 Length overall (metres) 164.30
2.9 Length between perpendiculars 154.00M
2.10 Extreme breadth 22.86M

2.10 Depth moulded 13.20M
2.11 Distance from waterline to top of hatch:
Fully Loaded
Full Ballast (holds not flooded)
Full Ballast (holds flooded)

2   Particulars – B
2.12 Deballasting time
2.13 Accepted loading rate
2.14 Distance from keel to:
Hatch top
Highest fixed point of vessel 39.40M (RADAR SCANNER)
2.15 Capacity – Ballast tanks (100%) – 4625 CUM (4744MT)
2.15 Capacity – Hold ballast N / A
Hold numbers
2.16 Constants excl fresh water ABT . 400MT
2.16 Daily fresh water consumption 11MT
2.16 Fresh water capacity 387.1 CUM
2.16 Capacity / production – evaporator PRESENT OUTPUT: NIL (under repairs)
2.16 Normal fresh water reserve
2.17 Fitted with shaft generator: NO
2.18 Onboard electric supply – v/hz 380 V / 50 CYCLES
2.18 Details of alternative supply 220v / 50 CYCLES

3.1 Holds
A Number of holds : 4 HOLDS
B Holds free of obstruction

Grain
Bale
TWEEN DESK
LOWER HOLD
GRAIN BALE GRAIN BALE
#1 / 1756.1 1616 CUM 2226.7  1980.9 CUM
#2 / 3478.8 3411 5112.9 4632.8
#3 / 3478.8 3411 5100.9 4620.7
#4 / 2077.8 2024.6 3345.6 3013.5

E Strengthened for heavy cargo YES
Empty holds
F Tanktop steel
G Corrugations NO
I Holds Co2 fitted YES
J Smoke detection YES
K Australian holdladders NO
L Stowage calculator NO
P Ventilation MECHANICAL – 3 BLOWERS
Air changes per hour

3.2 Hatches
A Numbers of hatches 7
B Make and type of hatchcovers – SINGLE PULL / CHINESE
F Distance from bow to fore of 1st hold
G Distance from stern to aft of last hold
H Vessel fitted with cement holes

4. Speed and Consumption
4.1 Beaufort scales 4 Douglas sea state 3

ABT. 13 KTS @ IFO (180CST) / ABT 24 MT
PD + abt 2.5mt mdo pd

4.2 Bunker Grades IFO 180CST RME25 MDO DMB OR DMA
4.3 Bunker capacities 100% 1518 CUM (1442 MT)
4.3 Bunker capacities 90% 1365 CUM (1298 MT)
4.4 Consumption port idle 2.5 MT PD
4.4 Consumption port 8 hours
4.4 Consumption port 24 hrs GEAR WORKING 3.0 Per weather working 24hrs
4.5 Engine make and type MITSUI B&W / 6300Z SERIES / 26 PST
4.6 Max output BHP – 11200 BHP @ 119 RPM
5. Bunkers

6. Classification
6.1 Classification society BUREAU VERITAS
6.2 Date of last special survey  reverting
6.3 Date of last annual survey 27 reverting
6.4 Vessel in enhanced survey program
6.4 Date of last inspection 21 / 8 / 02
6.4 Date of next inspection
6.5 Date of last dry-dock reverting
6.5 Place of last dry-dock reverting
6.6 Pollution incidents, last 12 months NIL
6.6 Details of pollution incident
6.7 Groundlings / collisions, last 12 months NIL
6.7 Details of groundings / collision NIL
6.8 ISM certified YES
6.8 Issued by REPUBLIC OF PANAMA
6.8 Date of issue 27 / 5 / 2003
6.8 Expiry date 21 / 2 / 2008
6.8 Date of last audit 05 / 2003
6.8 Date of next audit
6.8 Recommendations NIL
6.8 DOC certified YES
6.8 Issued by REPUBLIC OF PANAMA
6.8 Date of issue 1 / 10 / 2003
6.8 Expiry date 28 / 5 / 2008
6.9 Date of last port state control 8 / 9 / 2003
6.9 Place of last port state control KLAIPEDA

6.10 Passed without detentions
6.11 Crew ITF covered
6.12 ITF number
6.12 ITF issue date
6.12 ITF expiry date
6.13 Certificates
Issue date last annual endorsement Expiry date
Special survey 27 / 9 / 2005
Load line 27 / 9 / 2005
Safety equipment 3 / 9 / 2004
Gear Survey
Safety radio
Int. oil pollution 27 / 9 / 2005
Deratisation
6.14 Recommendations to certificates NIL
6.14 Recommendations details
6.15 IMO registration number 7725350
6.16 Expiry date of FMC certificate

7 Communication
7.1 Call sign HONG
7.2 Name of radio station
7.3 Inmarsat A phone number N/A
7.4 Inmarsat A fax number N/A
7.5 Inmarsat A telex number N/A
7.6 Inmarsat C telex number 435 544 810 ENRR
7.7 email address N/A

8. Insurance
8.1 Hull and Machinery insured value USD 2,000,000
8.2 Name of Owners P and I insurers AXA CORPORATE SOLUTIONS

9. Crew
9.1 Number of crew 26 including MASTER
9.2 Name of master Capt. Rakesh Bansal
9.2. Nationality of master INDIAN
9.3 Nationality of officers INDIAN
9.4 Nationality of crew INDIAN

10. Miscellaneous
10.1 Called at C.I.S Far East Ports N/A
Called at C.I.S When
Called at C.I.S where

10.2 Last 5 cargoes - reverting

10.3 Fitted for carriage of grain in accordance with chapter 1V Solas
1974 and amendments without requiring bagging
With ends untrimmed

10.4 Number of holds which may be left slack without requiring bagging, strapping and securing ONE

11. Cargo Gear
11.1 Gear, make IHI ELECTROHYDRAULIC CRANES
11.1 Gear, Type ELECTROHYDRAULIC CRANES
11.2 Number of cranes/ derricks 5 SWL – 25 LTONS SINGLE
With one set of Gemini combo cranes

TT strengths
1) 10mt / m2
2/3/4) 15mt / m2

Tweendeck strengths abt 4mt / m2
maindeck and hatchcovers abt 2.5mt/ m2

owners confirm that vessel has Gemini cranes which can combine over holds 3 and 4 in workable condition and can lift 50 mts.

81. Deleted

82. Deleted

83. Deleted

84. In case vessel will be employed in Liner service where it is customary to discharge cargoes without presentation of original Bills of Lading and no Letter of Indemnity is necessary,Charterers will discharge cargoes into custody of their agents and hereby guarantee that cargo(es) will only be released against presentation of original Bills of Lading.Owners confirm master will be instructed accordingly.

85. In case the Original Bill(s) of Lading are not available at discharge port(s),Owners/Master are to allow the discharge/release/change of destination of the entire cargo against a single Letter of Indemnity in Owner's Pandl Club standard wording signed by Charterers only.(It is understood that separate Letter of Indemnity will be required in case of change of destination.)

86. All taxes and/or dues on vessel and/or cargo and on Charter hire and freights arising out of cargoes carried or ports visited under this Charterparty shall be for Charterers account,except taxes levied on vessel's flag and in connection with port of vessel's registry which to be for Owners' account

87. Owners have the benefit of Charterers' agents in dealing with vessel's/crew's matters in all ports of call without paying agency fee.

88. It is expressly agreed that Charterers will not issue or cause to be issued Bills of Lading which are subject to the provisions of Hamburg rules – except in cases where compulsory is applicable.

89. Deleted.

90. REDELIVERY.

On dropping last outward sea pilot safe port in Charterers option any time day or night Sundays and holidays included. Within the following ranges

SKAW/CAPETOWN RANGE INCLUDING UK/CONT/FULL MEDITERRANEAN/BLACK SEA
CAPETOWN/ADEN RANGE
ADEN/JAPAN RANGE INLUDING PERSIAN GULF/FULL INDONESIA/FULL MALAYSIA
VERA CRUZ/BAHIA BLANCA RANGE
VALPARAISO/BALBOA RANGE

91. Deleted

92. ISPS CLAUSE AS ATTACHED TO BE INCOROPORATED IN THIS C/P

93. AMERICAN CLAUSE

If vessel calls at any US ports for purposes of loading and discharging cargo and/or embarking or
disembarking passengers,vessel's cargo gear and all equipment must comply with regulations
established by US Public Law 85-742 Part 9 Safety and Health Regulations for Longshoring).
If longshoremen are not permitted to work due to failure of the Master and/or Owners agent to comply
with the regulations and any delay resulting therefrom shall be for Owners account.

Owners warrant vessel has not called in any country which could prohibit vessel from
loading/discharging in the USA.

Owners warrant that they have secured and carry aboard the vessel a US Federal Maritime
Commissions Certificate of Financial Responsibility as required under the current US Water Quality
Improvement Act and Pollution Act 1990 as may be amended from time to time.In any case Owners
shall be liable for any and all consequences arising from their failure to obtain the aforementioned certificates.

## NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter
Party fails to be determined in accordance with the Laws of the United States of America, the
following clause shall apply:

Both-to-Blame Clause
If the ship comes into collision with another ship as a result of the negligence of the other ship and any
act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in
the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier
against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or
liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or
payable by the other or non-carrying ship or her Owners to the owners of said goods and set-off,
recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the
carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or
ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a
collision or contact.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall
contain the same clause.

GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York-Antwerp Rules 1994, and any subsequent amendments, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or owners of the goods to the Carrier before delivery and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL PARAMOUNT CLAUSE

All the Bills of Lading issued under this Charter Party shall contain the following clause:

'This Bill of Lading shall have effect subject to the provision of any legislation relating to the carriage of Goods by Sea which incorporates the rules relating to Bills of Lading contained in the International Convention dated Brussels, 25th August 1924, and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this Clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability'.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS

## CODE NAME "CONWARTIME 1993 "

(1) For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area ore zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of

the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.

Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject or is likely to be subject to a belligerents right of search and/or confiscation.

(4)

(a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS

## CODE NAME "CONWARTIME 1993 "- continued

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6)  The Vessel shall have liberty:

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7)  If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8)  If in compliance with any of the provisions of subject-clauses (2) to  (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of the Charter Party.

## BIMCO ISPS CLAUSE FOR TIME CHARTER PARTIES

(a)    (i)    From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii)    Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owner's account.

(b)    (i)    The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)    Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterer's account.

(c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterer's account, unless such costs or expenses result solely from the Owner's negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owner's account.

(d)    If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Bimco Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.